**ARTHUR ANDERSEN & CO., Petitioner,**

v.

**PERRY EQUIPMENT CORPORATION,**
**Respondent.**

No. 95–0444.

Supreme Court of Texas.

Argued March 19, 1997.

Decided May 16, 1997.

Ben Taylor, Dallas, Thomas C. Godbold, Houston, for Petitioner.

Christopher B. Allen, Michael P. Cash, James W. Paulsen, Houston, for Respondent.

CORNYN, Justice.

We withdraw our opinion of January 10, 1997, and substitute the following in its place. The parties' motions for rehearing are overruled.

In this accounting malpractice case, Perry Equipment Corporation (PECO) sued the accounting firm of Arthur Andersen for a faulty audit, which PECO relied on to purchase another company, Maloney Pipeline Systems. The audit favorably reported Maloney's financial condition when, in fact, the company was suffering substantial losses. Fourteen months after the sale, Maloney filed for bankruptcy. PECO sued for violations of the Deceptive Trade Practice Act, fraud, negligence, negligent misrepresentation, gross negligence, and breach of implied warranty. Based on the jury's verdict, the trial court rendered judgment for PECO. The court of appeals affirmed. 898 S.W.2d 914.

We address three issues presented by Arthur Anderson's application for writ of error. First, Arthur Andersen challenges PECO's consumer status because Maloney, rather than PECO, actually paid for the audit. Second, Arthur Andersen claims that the trial court failed to instruct the jury on the correct measure of damages. Third, Arthur Andersen contests the attorney's fees award, arguing that the percentage of recovery method is not a proper measure of attorney's fees under the DTPA, and that even if such fees were recoverable, no evidence supports the award. For the reasons discussed below, we reverse the judgment of the court of appeals and remand this case to the trial court for further proceedings.

I

When PECO, a successful manufacturer of oil filters used in compressors for gas pipelines, decided to expand its business into the gas metering field, it looked into acquiring Maloney Pipeline Systems, one of three United States companies in the liquid metering market. In the mid–1980s, PECO began negotiating with Maloney's owner, Ramteck II. As a condition of the sale, PECO required an audit of Maloney's financial statements. Maloney retained Arthur Andersen to conduct the audit. Maloney eventually provided PECO financial statements audited by Arthur Andersen. The statements showed Maloney to be a profitable business. Relying upon this information, on August 23, 1985, PECO purchased the Maloney stock from Ramteck II, Inc. for $4,088,237.

Soon after the purchase, Maloney began to show signs of serious financial decline. For example, three months after the sale, Maloney ran out of cash and required a $400,000 advance from PECO to continue operating. PECO also attempted other emergency financial measures, but to no avail. Fourteen months after the sale, Maloney filed bankruptcy. PECO presented uncontradicted evidence at trial that the purchase price for Maloney was a total loss from which PECO realized no return and which PECO wrote off.

PECO's experts testified that Arthur Andersen's audit contained serious errors and otherwise failed to follow acceptable auditing procedures. One of the most significant errors, the evidence showed, was the failure to verify that contracts Maloney reported as complete were in fact complete or that Maloney's estimates of costs and percentage of completion for ongoing contracts were accurate. Maloney later incurred substantial losses on these contracts. One expert testified that the audit was one of the worst he had ever seen. Another expert, an auditing professor, stated that if a student submitted the work, he would have given the student a failing grade.

The jury found Arthur Andersen 51 percent at fault and PECO 49 percent at fault. The jury also found that Arthur Andersen had committed fraud, DTPA violations, and breach of warranty, but that it was not liable for negligent misrepresentation or gross negligence. The jury assessed damages of $5,449,468, including the $4,088,237 PECO paid for Maloney and $1,361,231 for other expenses incurred by PECO in its attempt to salvage the company. PECO elected to recover under the DTPA. The trial court credited Arthur Andersen with the two million dollars that Ramteck II had already paid PECO in settlement, and then awarded PECO a total of $9,297,601.20, including damages, prejudgment interest, DTPA additional damages, attorney's fees, and costs.

## II

■ Arthur Andersen first contends that PECO is not a "consumer," a prerequisite to recovery under the DTPA. The DTPA defines a consumer as one "who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM.CODE § 17.45(4). In determining whether a plaintiff is a consumer, our focus is on the plaintiff's relationship to the transaction. *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 650 (Tex. 1996). As a condition of sale, PECO insisted that Maloney provide audited financial statements. Maloney hired Arthur Andersen for this specific purpose. PECO then relied on those statements in reaching its decision to purchase Maloney. Under these circumstances, we hold that PECO sought and acquired Arthur Andersen's services.

The next question is whether PECO sought and acquired these services *by purchase or lease,* inasmuch as it did not pay for the audit. Our decision in *Kennedy v. Sale,* 689 S.W.2d 890 (Tex.1985), controls this issue. There, we held that the DTPA does not require the consumer to be an actual purchaser or lessor of the goods or services, as long as the consumer is the beneficiary of those goods or services. *Id.*

The Texas Society of Certified Public Accountants, as amicus curiae, argues that a stock purchaser should not be considered a consumer simply because the corporation paid for an audit for the purchaser's benefit because virtually every external audit benefits third parties. Thus, any stock purchaser who reviews audited financial statements could bring a DTPA claim against the auditor.[1] Our holding is not so broad. In this case, the audit was rendered in connection with the sale of Maloney and was specifically required by PECO and intended to benefit PECO. Arthur Andersen was aware that PECO had required the audit and would rely on its accuracy and knew the specific purpose for which it was conducted. We accordingly hold that PECO is a consumer under the DTPA.

Arthur Andersen also urges us to reject PECO's consumer status based on the decision in *Hand v. Dean Witter Reynolds Inc.,* 889 S.W.2d 483 (Tex.App.—Houston [14th Dist.] 1994, writ denied). In *Hand,* the plaintiff alleged that her stock broker failed to purchase certain commodity option contracts after she requested that he do so. *Id.* at 487–88. After deciding that a commodity option contract is a right, not a "good," under the DTPA, *id.* at 498, the court next considered whether the plaintiff was a consumer by virtue of her purchase of "services." The DTPA defines services as including "services furnished in connection with the sale or repair of goods." TEX. BUS. & COM.CODE § 17.45(2). The court reasoned that the omission of any reference in the definition to services in connection with the sale of something other than a good indicated that services furnished in connection with the sale of intangibles did not fall within the definition of services under the DTPA. *Hand,* 889 S.W.2d at 498. The court then concluded: "The key to the [consumer status] determination is whether the purchased goods or services are an objective of the transaction or merely incidental to it." *Id.* at 500.

We believe that *Hand* confirms, rather than defeats, PECO's consumer status. Arthur Andersen's audit was not merely incidental to the sale of Maloney to PECO; it was required by PECO and was central to PECO's decision to consummate the purchase. Determining Maloney's financial condition was PECO's primary objective in acquiring Arthur Andersen's services. We therefore reject Arthur Andersen's contention that *Hand* defeats PECO's status as a consumer under the DTPA.

## III

Arthur Andersen next complains that the jury charge allowed the jury to award PECO the entire purchase price of Maloney, without instructing the jury to subtract the value of Maloney stock at the time of the sale.[2] Ar-

1. After PECO brought this action, the Legislature amended the DTPA to preclude consumers from suing under the DTPA for professional negligence or for claims arising from transactions involving consideration of more than $500,000. TEX. BUS. & COM.CODE § 17.49(c) & (g).

2. The charge asked the jury:

thur Andersen also contends that even if the court had properly instructed the jury, PECO failed to introduce any evidence that the stock was valueless at the time of sale, and thus failed to establish that it was entitled to the entire purchase price under either the "benefit-of-the-bargain" or the "out-of-pocket" measure of damages. PECO responds that in addition to direct damages, consequential damages are also recoverable under the DTPA. PECO thus argues that it is entitled to recover the purchase price as consequential damages.

■ Under the version of the DTPA in effect at the time PECO brought this action, a consumer could recover "the amount of actual damages" caused by the defendant's false, misleading, or deceptive conduct. TEX. BUS. & COM.CODE § 17.50(b)(1).[3] The amount of actual damages recoverable is "the total loss sustained as a result of the deceptive trade practice." *Kish v. Van Note*, 692 S.W.2d 463, 466 (Tex.1985)(citing *Smith v. Baldwin*, 611 S.W.2d 611, 617 (Tex.1980)).

■ Actual damages are those damages recoverable under common law. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 939 (Tex.), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). At common law, actual damages are either "direct" or "consequential." *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex. 1992) (Phillips, C.J., concurring); see RE-STATEMENT (SECOND) OF TORTS § 549 (1977) (outlining measure of damages for fraudulent misrepresentation). Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. *See Southwind Avia-*

tion, Inc. v. Avendano*, 776 S.W.2d 734, 736 (Tex.App.—Corpus Christi 1989, writ denied); *Anderson Dev. Corp. v. Coastal States Crude Gathering Co.*, 543 S.W.2d 402, 405 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. *See Bynum*, 836 S.W.2d at 163 (Phillips, C.J., concurring); *Coastal States*, 543 S.W.2d at 405; Anderson, *Incidental and Consequential Damages*, 7 J.L. & COM. 327, 328 (1987).

■ Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex.1995); *Moore v. Anderson*, 30 Tex. 224, 230 (1867). Under the common law, consequential damages need not be the usual result of the wrong, but must be foreseeable, *see Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex.1981), and must be directly traceable to the wrongful act and result from it. *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 295 (Tex.App.—El Paso 1992, writ denied); *El Paso Dev. Co. v. Ravel*, 339 S.W.2d 360, 363 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r.e.). Of course, foreseeability is not an element of producing cause under the DTPA. *See Haynes & Boone*, 896 S.W.2d at 182; *Prudential Ins. v. Jefferson Assocs.*, 896 S.W.2d 156, 161 (Tex.1995). Still, if damages are too remote, too uncertain, or purely conjectural, they cannot be recovered. *See White v. Southwestern Bell Tel. Co., Inc.*, 651 S.W.2d 260, 262 (Tex.1983); *see also Bynum*, 836 S.W.2d at 164 (Phillips, C.J., concurring).

....

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate PECO for its losses which resulted from such conduct?
    Do not increase or reduce the amount in one answer because of your answer to any other question about damages.
    ....
    ....
    Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

a. Purchase price of MPSI [Maloney]
    _____

b. Costs and expenses incurred by PECO as a result of its purchase and ownership of MPSI [listing 13 categories of costs and expenses]

**3.** In 1995, the Legislature amended § 17.50(b)(1) to permit recovery of "economic damages" and, if the defendant acted knowingly, "damages for mental anguish," instead of "actual damages." Act of May 17, 1995, 74th Leg., R.S., ch. 414, 1995 Tex.Gen. Laws 2992.

Under Texas common law, direct damages for misrepresentation are measured in two ways. *W.O. Bankston Nissan, Inc. v. Walters,* 754 S.W.2d 127, 128 (Tex.1988); *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 373 (Tex.1984). Out-of-pocket damages measure the difference between the value the buyer has paid and the value of what he has received; benefit-of-the-bargain damages measure the difference between the value as represented and the value received. *Leyendecker,* 683 S.W.2d at 373. Under the DTPA, a plaintiff may recover under the damage theory that provides the greater recovery. *Id.* Both measures of damages are determined at the time of sale. *See id.* at 373 (out-of-pocket damages are measured at the time of sale); *see also* Bullion, *An Understanding of Damages Recoverable Under the DTPA,* 20 ST. MARY'S L.J. 667, 670–72 (1989).

In this case, the jury was not asked to find direct damages at the time of the sale as well as consequential damages attributable to Arthur Anderson's misrepresentations. Rather, the jury was simply asked to consider the purchase price as part of the overall damages. PECO did present evidence that the purchase price was eventually a total loss. There was also evidence that Maloney was losing money at the time of the sale and continued to do so until it declared bankruptcy. What PECO did not establish, however, was how much of its loss occurred at the time of the sale and how much was attributable to subsequent events for which Arthur Anderson should bear legal responsibility. If subsequent losses were caused by Arthur Andersen's wrongful conduct and were not simply part of the risk a buyer of the business would have assumed, they may be part of PECO's consequential damages.

Subsequent losses, however, are recoverable only if the misrepresentation is a producing cause of the loss. *See Haynes & Boone,* 896 S.W.2d at 182. Without this limitation, an investor could shift the entire risk of an investment to a defendant who made a misrepresentation, even if the loss were unrelated to the misrepresentation. The basis of a misrepresentation claim is that the de-

fendant's false statement induced the plaintiff to assume a risk he would not have taken had the truth been known. But to allow the plaintiff to transfer the entire risk of loss associated with his investment, even risks that the plaintiff accepted knowingly or losses that occurred through no fault of the defendant, would unfairly transform the defendant into an insurer of the plaintiff's entire investment.

Because the charge failed to instruct the jury on the proper measure of direct damages, the submission was reversible error. But, because we find some evidence that Arthur Andersen's misrepresentation was a producing cause of PECO's loss, we remand this case for a new trial. *See Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994) (holding that remand is proper when defective liability question is submitted); *Jackson v. Fontaine's Clinics, Inc.,* 499 S.W.2d 87, 90 (Tex.1973) (remanding for new trial when defective damages question submitted); *Moulton v. Alamo Ambulance Serv., Inc.,* 414 S.W.2d 444, 449–50 (Tex.1967) (affirming remand for new trial when defective damages question submitted).

We emphasize that a plaintiff's recovery of damages is limited not only by his own evidence, but also by the defendant's evidence of the plaintiff's failure to reasonably mitigate losses or evidence of intervening causes. *See Dubow v. Dragon,* 746 S.W.2d 857, 860 (Tex.App.—Dallas 1988, no writ); EDGAR & SALES, TEXAS TORTS & REMEDIES § 43.04[1][b]; Tschoepe et al., *Aspects of Defending A Texas Deceptive Trade Practices–Consumer Protection Act Claim,* 20 ST. MARY'S L.J. 527, 561 (1989). If a plaintiff's losses are attributable to his own mistakes or factors outside either of the parties' control, the defendant may be entitled to an appropriate limiting instruction to the jury.

## IV

Because we are remanding this case for a new trial, we turn now to Arthur Andersen's complaint that the trial court improperly awarded PECO attorney's fees calculated as a percentage of recovery.[4]

---

4. The jury charge requested the jury to calculate attorney's fees three ways: in dollars and cents,

■ Attorney contingency fee contracts serve two main purposes. First, they allow plaintiffs who cannot afford to pay a lawyer up-front to pay the lawyer out of any recovery. *See* See, *An Alternative to the Contingent Fee,* 1984 UTAH L.REV. 485, 490 n. 14. Second, such contracts, because they offer the potential of a greater fee than might be earned under an hourly billing method, compensate the attorney for the risk that the attorney will receive no fee whatsoever if the case is lost. *Id.* The lawyer in effect lends the value of his services, which is secured by a share in the client's potential recovery. POSNER, ECONOMIC ANALYSIS OF LAW § 21.9 (4th ed.1992). Under some contingency fee contracts, the attorney also agrees to advance the out-of-pocket costs of the litigation. In such cases, the attorney not only risks loss of the fee, but also risks loss of actual expenditures.

Arthur Andersen complains that an award of contingency fees under a fee-shifting statute like the DTPA forces defendants to pay fees unrelated to the amount of work performed. While this is not always true, shifting these fees to the defendant presents two problems.

First, a contingent fee award based solely on evidence of a percentage fee agreement between a lawyer and client may be determined without regard to many of the factors that should be considered when determining reasonableness. The DTPA allows recovery of "reasonable and necessary attorneys' fees." TEX. BUS. & COM.CODE § 17.50(d). Factors that a factfinder should consider when determining the reasonableness of a fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

TEX. DISCIPLINARY R. PROF. CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. (STATE BAR RULES, art. X, § 9); *see also Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990); *cf. General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 960–961 (Tex.1996) (discussing the relative strengths and weaknesses of the contingent fee and lodestar methods of awarding attorneys fees in the context of a court-approved class action settlement). While we do not doubt that many plaintiffs must contract for a contingent fee to secure the services of a lawyer, we do not believe that the DTPA authorizes the shifting of the plaintiff's entire contingent fee to the defendant without consideration of the factors required by the Rules of Professional Conduct. A contingent fee may indeed be a reasonable fee from the standpoint of the parties to the contract. But, we cannot agree that the mere fact that a party and a lawyer have agreed to a contingent fee means that the fee arrangement is in and of itself reasonable for purposes of shifting that fee to the defendant.

■ A party's contingent fee agreement should be considered by the factfinder, *see* TEX. DISCIPLINARY R. PROF. CONDUCT 1.04(b)(8), and is therefore admissible in evidence, but that agreement cannot alone support an award of attorney's fees under Texas Business and Commerce Code section 17.50(d). *See* Brister, *Proof of Attorney's Fees in Texas,* 24 ST. MARY'S L.J. 313, 324 (1993). In other words, the plaintiff cannot simply ask the jury to award a percentage of

as a percentage of PECO's recovery, and as a combination of dollars and cents and percentage

of recovery.

the recovery as a fee because without evidence of the factors identified in Disciplinary Rule 1.04, the jury has no meaningful way to determine if the fees were in fact reasonable and necessary.

Second, because the jury is not informed what the total amount of the judgment will be, the jury can only speculate about whether a percentage of that unknown recovery will represent a reasonable and necessary fee in that particular case. Rather than leave this question to speculation, the jury must decide the question of attorney's fees specifically in light of the work performed in the very case for which the fee is sought.

In light of these concerns, we hold that to recover attorney's fees under the DTPA, the plaintiff must prove that the amount of fees was both reasonably incurred and necessary to the prosecution of the case at bar, and must ask the jury to award the fees in a specific dollar amount, not as a percentage of the judgment.

For the foregoing reasons, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.